**David LIVINGSTON, as President of District 65, Retail, Wholesale and Department Store Union, A.F. of L. and C.I.O., Plaintiff,**

v.

**Ivan C. McLEOD, as Regional Director of the National Labor Relations Board, Second Region, Defendant.**

United States District Court
S. D. New York.
Oct. 16, 1962.

TYLER, District Judge.

Plaintiff ("District 65") seeks a temporary injunction restraining the defendant Regional Director from conducting a representative election pursuant to the National Labor Relations Act (29 U.S.C. § 151 et seq.). The Regional Director has cross-moved to dismiss District 65's complaint or, in the alternative, for summary judgment.

Essentially, this case presents a problem of interpretation of the comparatively new and "hybrid" procedure introduced in 1959 into the Act by Section 8(b) (7) (C), which blends the elements of an unfair labor practice and a representative proceeding (29 U.S.C. § 158 (b) (7) (C)).

The pertinent statutory language makes it an unfair labor practice for a union or its representatives:

"(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

"(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9(c) of this Act,

"(B) where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted, or

"(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Pro-*

Weisman, Allan, Spett & Sheinberg, New York City, for plaintiff. Irving Rosen, New York City, of counsel.

Stuart Rothman, Washington, D. C., for defendant. Marcel Mallet-Prevost, James C. Paras and Solomon I. Hirsh, Washington, D. C., of counsel.

*vided,* That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c) (1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further,* That nothing in this subparagraph (C) shall be construed to prohibit picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

"Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8(b)."

Although the parties assert different inferences to be drawn therefrom, the essential facts appear clear and beyond dispute.

On July 24, 1962, Lyman T. Corbin, Co., Inc., a concern in the direct mailing industry, filed an unfair labor practice charge with the National Labor Relations Board, Second Region, alleging that District 65 was picketing the Company's premises in violation of Section 8(b) (7) (C) of the National Labor Relations Act. On the same day the Company also filed with this regional office a representation petition (Board Case No. 2–RM–1234) asking the Board to conduct a representation election to determine the Union's representative status.

Pursuant to the provisions of Section 10(*l*) of the Act and Section 102.73 of the Board's Rules and Regulations, Series 8, as amended, 29 U.S.C.A. Appendix, this charge, designated Case No. 2–CP–175, was promptly investigated by direction of the Regional Director. From this investigation, which included interviews with representatives of both the Company and District 65, the Regional Director could have ascertained and allegedly did ascertain the following facts:

District 65 had been engaged in an organizing campaign among Corbin's employees since February, 1962, distributing organizational leaflets and union authorization cards outside the employer's premises at least once a week. A leaflet dated March 5, for example, stated: "By joining District 65, the Union for Direct Mail workers you can win for yourself the same wages and conditions that organized Direct Mail workers enjoy".

On June 29, District 65 distributed a leaflet stating, in pertinent part: "We will very shortly approach your employer to set up negotiations for the Standard Direct Mail Agreement, which will mean substantial increases, benefits and better working conditions for all of you * * We urge that those of you who have not signed cards to do so right away." At about the same time, District 65 sent a letter to the Corbin employees which stated, *inter alia:*

> We now have the substantial majority of the workers signed up in your shop, and we are prepared to approach your employer for Union negotiation on your behalf, and to negotiate a contract which will mean substantial gains to all Corbin workers.

The letter then went on to urge all the employees to attend the "final meeting [set for July 3], prior to approaching the Corbin management". At the meeting on July 3, according to the official newspaper of District 65, "The 65er", the employees voted to go on strike if Corbin did not agree to a District 65 contract. Thereafter, on July 6, District 65 distributed a leaflet in front on Corbin's premises which stated:

> WE'RE READY. We will be seeing your employer this coming week. We will ask that they recognize

District 65 as the bargaining agent for the workers of Lyman T. Corbin, Co., and that they negotiate with your shop committee on all matters pertaining to wages, benefits and working conditions * * * We urge those of you who are not already members to join with the substantial majority of your fellow workers who are now members of District 65.

On July 11, two organizers for District 65, Jerry Barrafato and Peter Van Delft, came to the office of John A. Reinhart, Corbin's assistant general manager. Van Delft told Reinhart that District 65 was not there to ask for recognition for a contract but to get the Company's promise to establish for its employees the minimum rates and fringe benefits which existed in the shops which did have contracts with the Union. Van Delft and Barrafato gave Reinhart a typewritten sheet of paper captioned "DIRECT MAIL RATES AND CONDITIONS—RATES AS OF AUGUST 1, 1962". In addition, Reinhart was given two booklets describing the Union's Security Plan (health benefits) and Pension Plan. Van Delft told Reinhart that if District 65 did not get an answer from the Company within a reasonable time, the Union would "feel that it would be necessary to inform the public". As the organizers prepared to leave, Reinhart asked that they put their request in writing and mail it to him, and he would see to it that appropriate action was taken.

The next day, July 12, Corbin received a letter dated July 11 from the Union (signed by Van Delft) which stated:

This will confirm in writing, pursuant to your request, the essence of our conversation on this date.

District 65, R.W.D.S.U., AFL–CIO, through its representatives, organizers Peter Van Delft and Jerry Barrafato, met with your representative, Mr. Reinhart, on July 11, 1962, and requested that Lyman T. Corbin Co., which is a company engaged in the Direct Mail Letter business, establish in its place of business, on behalf of its employees, all of the rates of pay, welfare benefits and such other conditions which exist in Unionized shops and which do not presently exist in Lyman T. Corbin Co.

The Union further requested that a meeting quickly be held for the purpose of reaching an agreement on the establishment of these conditions in Lyman T. Corbin Co.

Our representatives left the meeting this afternoon with the understanding that the company will, in the next few days, set up such a meeting.

On July 12, Charles L. Dungan, vice president of Corbin, wrote the following letter in reply:

This will acknowledge receipt of your letter of July 11, 1962 in which you request a meeting for the purpose of reaching an agreement with our Company.

We do not know whether you represent a majority of our employees in appropriate bargaining unit and we suggest that you establish your claim through the procedures of the National Labor Relations Board. We do not believe that at the present time, the meeting you request can serve any useful purpose.

On July 17, Al Bernknopf, vice president for administration for District 65 called Dungan and told him that the Company had not interpreted the Union's letter correctly. Bernknopf stated that the Union did not want to be the bargaining agent but wanted to sit down and establish the prevailing industry rates for Corbin's employees. According to Dungan, Bernknopf said that he did not want to "marry us, he just wanted to keep company". Bernknopf kept insisting that the Company and the Union meet to discuss the situation but Dungan replied that his letter was specific and that District 65 should go to the NLRB for an election. Bernknopf then said that he was calling out of courtesy before establishing a picket line. Dungan re-

plied: "If you establish a picket line there's nothing I can do about it, but I wish you would go to the Board so we can settle this thing in a peaceful way." Bernknopf said that he could not go to the Board, and that he would have to have another meeting of the employees who had signed cards with District 65. The telephone conversation ended at this point. In the next few hours, District 65 handed out leaflets in front of the Company premises announcing that a meeting of Corbin's employees would be held that night at District 65 headquarters.

The next day, July 18, some pickets appeared at noon in front of the building located at 45 West 18th Street in which Corbin's offices are located. One group patrolled between the main door and 6th Avenue on 18th Street, and another group was between the main door and 5th Avenue. Police kept both groups away from the main door. The demonstrators were carrying signs, one of which said:

CORBIN WORKERS HAVE NO
HOSPITALIZATION
INSURANCE
PENSIONS
SICK BENEFITS
UNION WORKERS DO
DISTRICT 65 R.W.D.S.U.

On July 24, picket lines, consisting at least in part of Corbin employees, again appeared in front of the main entrance to the building in which Corbin is located, and in front of an alley leading to truck bays at the side of the building between 18th and 19th Streets, and also on the 19th Street side in front of the alleyway. Officials of District 65 were also present. The alley and truck bays are used for delivery to all tenants in the building (Corbin is not the sole tenant) and are not used by either customers or employees. The pickets carried at least five different types of signs which read:

THE LYMAN T. CORBIN WORK-
ERS ON STRIKE FOR EQUAL

PAY RATE WITH UNION SHOPS DISTRICT 65, AFL–CIO. RETAIL WHOLESALE DEPARTMENT.

LYMAN T. CORBIN WORKERS ARE PAID $1.15 PER HOUR. UNION SHOPS PAY $1.72 PER HOUR MIN. DISTRICT 65, AFL–CIO

THE LYMAN T. CORBIN WORK-ERS ON STRIKE FOR MEDICAL COVERAGE, HOSPITAL, PEN-SION, INSURANCE, SICK BENE-FITS. UNION SHOPS HAVE THESE BENEFITS. DISTRICT 65, AFL–CIO

THE LYMAN T. CORBIN WORK-ERS CANNOT LIVE ON $43.13 PER WEEK. DISTRICT 65, AFL–CIO

As a result of the picketing, truck drivers employed by other employers have, at times, refused to make pickups or deliveries for Corbin.[1]

On the basis of the foregoing matters, the Regional Director determined that the Union's picketing was within the purview of Section 8(b) (7) (C) of the Act. Accordingly, since a representation petition had been filed within a reasonable time from the commencement of the picketing, the Regional Director, pursuant to Sections 102.75 and 102.77 of the Board's Rules and Regulations, suspended proceedings on the charge and proceeded to investigate the representation petition. In furtherance of that investigation, a meeting was held on August 6, 1962, between an agent of the Regional Director and representatives of both the Company and District 65. At this meeting, the latter contended, *inter alia,* that certain employees were not eligible to vote because of their alleged temporary employment status. The Regional Director decided, however, that the eligibility of such employees should be determined following the balloting in accordance with the Board's "challenge-

---

1. This finding by the Regional Director is not disputed or denied by District 65 in its moving papers.

ballot" procedure. District 65 was so advised of this determination at the meeting.

Having determined that the representation petition raised no questions which should be decided by the Board before election, the Regional Director concluded that an expedited election should be held as provided for in the first proviso to Section 8(b) (7) (C). Accordingly, pursuant to Section 102.89 of the Board's Rules and Regulations, the Regional Director, on August 8, 1962, dismissed the Company's unfair labor practice charge and directed that a representation election be held on August 15, 1962.

The August 15 election has been held and the ballots impounded by agreement of the parties pending the outcome of this litigation.

In support of its demand for a preliminary injunction District 65 argues that "(a) there is nothing in Section 8(b) (7) which authorizes the Regional Director to determine the object of picketing without a hearing, and (b) if it is so construed, it must be held to be unconstitutional".

█ It is true that this court has jurisdiction to enjoin acts of administrative officials which (a) are unsupported by statutory authority, Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), or (b) work a deprivation of a constitutional right, Fay v. Douds, 172 F.2d 720 (2d Cir. 1949).

But a recent decision of the Ninth Circuit, in a case very similar to the one at bar, supports our rejection here of District 65's contentions. Department and Specialty Store Employees' Union, Local 1265 v. Brown, 284 F.2d 619 (9th Cir. 1961), cert. den. 366 U.S. 934, 81 S.Ct. 1659, 6 L.Ed.2d 846 (1961).[2]

█ By its 1959 enactment of Section 8(b) (7) (C) (29 U.S.C.A. § 158(b) (7) (C)) Congress has authorized the National Labor Relations Board to take specified action with respect to picket-ing, an object of which is to compel an employer to recognize a particular union. Specifically, the Board is authorized, upon a finding that Section 8(b) (7) (C) picketing is taking place, and upon other conditions set forth in Section 8(b) (7) (C), to proceed upon a petition for a representation election which has been filed in accordance with Section 9(c) (1) and to order such election. The Board is directed to proceed to order the election, in the language of the statute, "forthwith, without regard to the provisions of section 159(c) (1)".

Pursuant to Section 9 of the Act, the Board has promulgated rules setting forth its procedures in cases arising under Section 8(b) (7) (C). National Labor Relations Board Rules and Regulations, Statements of Procedure, eff. January 1, 1962. In particular, Section 102.77(b) of the Rules and Regulations provides that " * * * in any case in which it appears to the regional director that the proceeding raises questions which cannot be decided without a hearing, he may issue * * * a notice of hearing * * *". See also Section 101.23(c), Statements of Procedure. By negative implication, this authorizes the Regional Director to order an election without first conducting a hearing.

That such authority is within the scope of Section 8(b) (7) of the statute is manifest from the language of that section itself. The Regional Director is to proceed "forthwith" and "without regard to the provisions of section 159(c) (1)". Section 9(c) (1) in prescribing the procedure normally to be followed by the Board in acting upon petitions for representation election, directs that a hearing be held before an election is ordered.

The Chairman of the House Labor Committee has stated that it is a purpose of this section to guarantee to both sides in a labor dispute that elections can be rapidly held without the practical necessity of conducting or suffering strikes,

2. Popularly referred to and sometimes cited as the "Kinney" case, after the employer company there involved.

picketing, etc. pending final determination of rights by the Board and, finally, the courts. He further stated that "* * * it was not the intent that this proviso * * * should be used as a device or subterfuge by a picketing union to bring about a pre-hearing or so-called quickie election". (See Department and Specialty Store Employees' Union, Local 1265 v. Brown, supra, 284 F.2d at p. 627)

Accordingly, it is determined that the procedure followed in the case at bar by the Regional Director is supported by appropriate statutory authority.

Nor does this procedure work a deprivation of due process of law.

█ District 65 argues that it has been deprived of its constitutional rights by the failure of the Regional Director to accord it a formal hearing. In practical effect, it contends that the "property right" it is losing thereby is its reputation and bargaining strength in the industry in the event (as it suspects will be the case) the August 15 election ballots are counted and disclose a defeat for District 65.[3] Thus, it would appear that the essential legal question here raised by District 65 is whether the holding of a representation election and publication of its results are so damaging to the property rights of the Union that, notwithstanding the availability of a hearing before other rights of District 65, such as the right to picket, can be effected[4], such election and publication fall without the class of preliminary administrative actions which, under the rule of Ewing v. Mytinger and Casselberry, 339 U.S. 594, 70 S.Ct. 870, 94

L.Ed. 1088 (1950), may be taken without a hearing.

"It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination." Ewing v. Mytinger and Casselberry, supra, at p. 599, 70 S.Ct. at p. 872. As we have seen, the statute and Board procedures thereunder permit further proceedings, subject to judicial review, in the event District 65 loses the election but still continues its picketing. Moreover, to the extent that District 65's basic contention rests in part upon the proposition that ineligible "temporary" employees were permitted to vote in the August 15 election, the Union could resort to the challenge ballot procedures contemplated in Board Rules 102.69 and 102.78. See Inland Empire District Council v. Millis, 325 U.S. 697, 710, 65 S.Ct. 1316, 89 L.Ed. 1877 (1945).

Under the circumstances, it is concluded that the refusal of the Regional Director to afford District 65 an adversary or trial-type hearing did not amount to a deprivation of due process. The Regional Director acted in accordance with the plain mandate of the Congress. Department and Specialty Store Employees' Union, Local 1265 v. Brown, supra, 284 F.2d at ps. 626–627. To hold otherwise might well impinge unnecessarily upon the substantial rights of other interested parties and negate the clear Congressional intent, in enacting Section 8(b) (7), that elections of this kind be held "forthwith". Ibid, p. 626; see, generally, Ewing v. Mytinger and Casselberry, supra, at p. 600, 70 S.Ct. at p. 873.

---

3. See, for example, page 8 of the affidavit of Peter Van Delft verified on August 31, 1962.

4. "The Board has adopted the following practice as the sequel to the holding of an expedited election under § 158(b) (7): It proceeds against the union, which has continued to picket after the election is held and its results published, under the authority of § 158(b) (7) (B), which proscribes picketing for organization purposes within twelve months after a

"valid election under Section 159(c)". The Board enters the courts to seek a preliminary injunction under a § 160(l) petition pending the outcome of its own administrative proceedings on the 8(b) (7) (B) unfair labor practice charge. Brown v. Department & Specialty Store Employees' Union, Local 1265, 187 F. Supp. 619 (N.D.Cal.1960). It is at this point that the union is accorded its hearing, before the court, on the issue of the validity of the original election.

Nor can I say, on the basis of the facts as recited above, which are not in dispute, that the Regional Director was unwarranted in finding that the picketing of District 65 was of the type proscribed by Section 8(b) (7) (C).

District 65's motion for temporary injunction is denied, and the defendant's motion to dismiss the complaint is granted.